**In re ARGUS GROUP 1700, INC., Debtor.**

**In re ARDEN PHOENIX GROUP 1700, L.P., Debtor.**

**Bankruptcy Nos. 96–14368DWS, 96–14369DWS.**

United States Bankruptcy Court, E.D. Pennsylvania.

Aug. 6, 1996.

Charles M. Golden, Obermayer, Rebmann, Maxwell & Hippel, LLP, Philadelphia, PA, for Debtor.

Henry F. Siedzikowski, Elliott, Reihner, Siedzikowski & Egan, P.C., Blue Bell, PA, for Milton Steinman.

Joseph F. Minni, United States Trustee, Philadelphia, PA.

## *OPINION*

DIANE WEISS SIGMUND, Bankruptcy Judge:

Before the Court are two applications filed by the Debtor to authorize the appointment of certain professionals in this recently filed Chapter 11 case: (1) Application to Employ Spector, Gadon & Rosen, P.C. ("Rosen" or "Rosen Firm") as Special Counsel ("Rosen Application"); and (2) Application to Employ Zelenkofske Axelrod & Co., Ltd. ("Zelenofske") as Forensic Accountants ("Zelenofske Application" and with the Rosen Application, the "Applications"). Objections to the Applications were filed by Milton Steinman ("Steinman"), a limited partner of Debtor Arden Phoenix Group, 1700, L.P. The United States Trustee also objects to the Zelenofske Application. A hearing on the Applications was held on July 2 and July 8, 1996. Based on the consolidated record

made at that hearing and for the reasons that follow, we deny both Applications.

## BACKGROUND

Arden Phoenix Group 1700, L.P. ("Phoenix") owns the real property located at 1700 Sansom Street, Philadelphia and the improvements thereon, consisting of an office building. On May 10, 1996, Phoenix and its sole general partner, Argus Group 1700, Inc. ("Argus") filed voluntary petitions under Chapter 11 of the Bankruptcy Code. As is typical with single asset real estate cases, Phoenix and Argus have few trade debts. Aside from their obligations for the mortgage debt and to a related entity, Argus Group, Inc. ("Group"), the total unsecured debt is less that $120,000. Atypical is the fact that Phoenix is current with its mortgagee Carnegie Bank. With scheduled debt of $1,237,940 against property valued at $2,000,000, Debtor was able to easily reach a consensual cash collateral agreement which was approved by the Court.

According to Debtors' counsel, what drove the Debtors into bankruptcy was mounting litigation costs resulting from disputes with Steinman being waged in both state and federal court (the "Steinman Litigation"). A review of Debtors' Schedules reveals that the Rosen Firm which represents the Debtors and related parties in the various Steinman cases is the largest creditor with a prepetition claim of approximately $112,000.[1] Within the first two weeks of the bankruptcy cases the following identical documents were filed in each case: (1) Motion to administratively and substantively consolidate the two cases ("Consolidation Motion"); (2) the Zelenofske Application; (3) a Disclosure Statement and Chapter 11 Plan of Reorganization; and (4) the Rosen Application. The Consolidation Motion was granted after notice and hearing in the absence of any objection thereto.[2] The Disclosure Statement, which

---

**1.** Not included because not scheduled is the prepetition obligation to Zelenofske in the amount of $21,505.50.

**2.** Hearing on the Consolidation Motion was held on July 3, 1996 before the matters found in this Opinion were disclosed. In the absence of an objection by Steinman who is closest to the issues bearing on the appropriateness of substantive consolidation, the Court entered the Order

approving full consolidation on Debtors' counsel's representation that the assets and liabilities of both Debtors were the same. In light of the record made on the Applications, we have reason to question whether that representation was accurate and whether substantive consolidation was improperly sought. While the scheduled claims against both Debtors are the same, the Steinman claims are different as to each Debtor.

was objected to by Steinman, was withdrawn at the suggestion of the Court as it was apparent that it failed to adequately discuss the *sine qua non* of the bankruptcy case, the Steinman Litigation.

The Steinman Litigation began in October 1995 when he filed a Complaint against both Debtors as well as Craig A. Spencer ("C. Spencer"), Robert S. Spencer ("R. Spencer") and Group in the Court of Common Pleas of Philadelphia County ("State Court"). C. Spencer owns all of the stock of both Argus and Group, a corporation that manages Phoenix and thirteen other real estate projects. C. Spencer is also the individual who speaks for both Debtors. R. Spencer is the father of C. Spencer and acts as a financial consultant to the Debtors. In its present form, as amended, the Complaint is a 53–page pleading, containing the following eight counts: (I) securities violation v. C. and R. Spencer and Group;[3] (II) fraudulent misrepresentation and concealment v. C. and R. Spencer, Group and Argus; (III) negligent misrepresentation v. C. and R. Spencer, Group and Argus; (IV) breach of fiduciary duty v. Argus and C. Spencer; (V) appointment of a receiver v. Phoenix; (VI) disgorgement v. Argus and C. Spencer; (VII) accounting v. Phoenix, Group, and Argus; and (VIII) breach of limited partnership agreement v. Spencer, Argus and Phoenix. Exhibit S–1. The essence of the Complaint is gleaned from its preamble as follows:

> "Plaintiff Milton Steinman demands compensatory and punitive damages and equitable relief arising from the Defendants fraudulently inducing his investment in defendants' real estate limited partnership, and then secretly siphoning off hundreds of thousands of dollars from this limited partnership to themselves and their alter ego entities through, *inter alia*, hundreds of thousands of dollars in concealed fees paid to Defendants; mortgages in violation of the limited partnership agreement upon the limited partnership's property; misrepresentations, material omissions and distributions made from borrowed funds fraudulently intended to lull Plaintiff into

maintaining his investment; the concealment [of R. Spencer's criminal conviction] and funding [of Ponzi schemes]...."

While the State Court has apparently not reached any of the issues on the merits, there have been numerous discovery disputes which have generated a series of orders and concomitantly a brouhaha between counsel Rosen and Steinman's counsel, Elliot Reiener Siedzikowski & Egan, P.C. ("Siedzikowski") regarding the modus operandi employed by Siedzikowski in securing a certain sanctions order, Exhibit D–4. That Order, dated February 21, 1996, compelled, Group and C. and R. Spencer to produce documents within seven days or pay Plaintiff $1000 per day for each day the Order is violated. That Order also set a hearing for March 13, 1996 for the defendants to show cause why they and their counsel should not be held in contempt for willful violations of prior orders and why a receiver should not be appointed to manage Phoenix and an independent counsel appointed to protect the limited partnership interests in the litigation. Defendants appealed the Order to the Superior Court and on March 13, 1996 were granted a stay pending appeal. A subsequent motion by Steinman to quash the appeal because the Order was interlocutory was granted by the Superior Court which vacated the stay on May 7, 1996 and remanded to the State Court to award Steinman his counsel fees. Exhibit S–2. The bankruptcy cases were filed the next day, staying the State Court proceedings, including the threatened receivership.

During the aforementioned discovery dispute, the defendants apparently became convinced that they could not receive a fair hearing in the State Court. As a result, on March 7, 1996, Phoenix commenced suit in federal court under the Civil Rights Act, 42 U.S.C. § 1983, against Steinman and various John Doe defendants identified as employees on the staff of the State Court Judge Eugene Maier and the State Court "who wilfully acted to deprive plaintiff of his [*sic*] federal rights by actively assisting defendant to gain

---

**3.** While the caption suggests that Count I is also directed at Argus, the allegations and prayer for

relief state otherwise.

undue influence over Judge Maier to the detriment of plaintiff." Exhibit D–3 (the "Federal Action").[4] The State Court Action has now been removed to Federal Court and marked as a related case to the Chapter 11 cases and the Federal Action. A motion to remand apparently has or was being filed.

### A. The Rosen Application

The Rosen Application seeks to employ the Rosen Firm to continue its representation of the Debtors in the State Court Action and the Federal Action as well as in connection with enforcement of a consent order entered in a lawsuit between Argus and another limited partner. As previously stated, retention is sought to evaluate amendments to the Federal Action which, according to the Application, is an immediate concern. While the Application stresses the significance of the Federal Action, it is clear from the testimony that the main event for which Rosen's counsel is sought is the State Court Action, described by Debtors as the "Related Proceeding." Additionally, Rosen testified that he expected to actively assist the Debtors in the defense of Steinman's pending Motion for the Appointment of a Trustee which, we note, raises the same issues as the State Court Action and the objections to Steinman's proof of claim. Debtors urge Rosen's retention due to his knowledge of the facts and documents relating to the various claims and counterclaims raised in these matters. According to Rosen, the Debtors could represent themselves with respect to the State Court Action although not without incurring otherwise unnecessary learning curve costs but would be "vulnerable" on the Federal Action although why that is so was not explained. Steinman objects to the Rosen Application on the grounds that the Rosen Firm's representation of Debtors as well as the Spencers and Group presents an impermissible conflict. The interests of the partnership Phoenix and its general partner Argus, he contends, are materially adverse to those of the Spencers and Group.

### B. The Zelenofske Application

On or about March 19, 1996, Phoenix, at the recommendation of Rosen, retained the Zelenofske Firm to perform a forensic accounting to assist in the defense of the State Court Action.[5] As stated in the Report on Sources and Uses of Cash (the "Report") which memorializes Zelenofske's findings, Exhibit D–2, Zelenofske was requested to "apply certain investigative procedures to the financial records" of Phoenix. According further to the Report, "[t]he principle objective of [the] investigation was to classify all payments such that an investor, or a trier of fact, could examine the payments for their propriety as a property acquisition cost, a property improvement cost or an operating expenditure." Id. The investigation specifically examined the propriety of the expenditures relative to the limited partnership agreement and management service agreement and in particular focused on the propriety of payments to related parties, such as Group and the Spencers.

On April 11, 1996, Zelenofske was paid $6,750.00 by Phoenix. The investigation was approximately 50% complete at the time of the Debtors' bankruptcy filings on May 10, 1996 according to the partner in charge of the engagement, Leon LaRosa, CPA, and based on the work performed as of that date, Zelenofske has a $21,505.50 prepetition claim for outstanding fees. Work continued postpetition and the Report was completed in

---

4. According to Rosen, service of the Complaint was not made in the Federal Action because prior thereto, the Superior Court entered the stay. Debtors contend that the vacation of the stay "forced the Debtor into bankruptcy, necessitating the approval of Spector Gadon & Rosen as special counsel to determine such additions as may be necessary as additional claims in the federal Civil Rights Suit against the plaintiff for additional damages for driving the Debtor(s) into bankruptcy by the conduct described in the Civil Rights Suit." Rosen Application ¶ 6.

5. Testimony provided by one of the partners at the Zelenofske firm, Mr. LaRosa, indicated that Group retained the Zelenofske Firm and paid its fees. In his Supplemental Affidavit, Mr. LaRosa corrects this testimony to reflect his firm's engagement by Phoenix and its receipt of payment from Phoenix. The firms bills are, however, submitted to Group. His lack of clarity on the identity of his client is reflective of the reality that the Report was generated as a defense tool in the State Court litigation without regard to the separate identities and interests of each defendant.

draft on May 17, 1996 and in its final form on June 17, 1996.[6]

The Zelenofske Application as originally filed on May 17, 1996 was so inadequate in its exposition of the nature of the proposed engagement that the Court entered an Order believing it to be a routine application to retain accountants in a Chapter 11 case. Since Debtors did not contemporaneously serve the Application on the U.S. Trustee and other required parties, no objection suggested that the Application was other than routine. On subsequent objection of Steinman to the Zelenofske Application, the Order authorizing the appointment was vacated, and the Debtors were directed to file an Amended Application fully detailing the intended services to be rendered. An Amended Application was filed although it was still defective in its disclosure. While testimony in support and opposition to the Zelenofske Application was taken, the Court's consideration of the Application was conditioned on the filing by LaRosa of an amended Affidavit disclosing the payments and claims of his firm and stating whether Zelenofske waives its prepetition claim so as to be disinterested under §§ 327(a) and 101(14).[7] That document has now been filed.

According to the Amended Application, Zelenofske's contemplated services are threefold: (1) to conduct the previously described forensic investigation; (2) to issue a Financial Report on the propriety of the transactions; and (3) to provide expert testimony in bankruptcy court proceedings in connection with, *inter alia*, the Trustee Motion and the Objections to Steinman's proof of claim.[8] Notably the two former tasks have already been completed. The Zelenofske Application is opposed by Steinman and the U.S. Trustee because of the apparent conflict between the Debtors and the related parties. Additionally, the U.S. Trustee disputes the appropriateness of the estates bearing the cost of the Report on the grounds that it benefits the individuals and their related entity and not the Debtor estates.

DISCUSSION

A. *The Rosen Application*

 Debtors seek to employ the Rosen firm as special counsel pursuant to § 327(e) of the Code which provides as follows:

> The trustee, with the court's approval, may employ for a specified purpose, other than to represent the trustee in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed.

According to legislative history,

> [t]his subsection does not authorize the employment of the debtor's attorney to represent the estate generally or to represent the trustee in the conduct of the bankruptcy case. The subsection will most likely be used when the debtor is involved in complex litigation, and changing attorneys in the middle of the case after the bankruptcy case has commenced would be detrimental to the other litigation.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 328 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 38–39 (1978). Employment of counsel for the debtor-in-possession, on the other hand, is governed by § 327(a) which requires that the proposed attorneys "not hold or represent an interest adverse to the estate" *and* "are disinterested persons." A "disinterested person" is one that, *inter alia*, is not a creditor.

---

**6.** Mr. LaRosa testified that he had not reviewed the draft form or underlying work papers and indeed found errors that required correction after the draft was released.

**7.** Given the conclusion reached below that the Zelenofske Firm is not a professional under § 327(a) whose engagement must be approved by the court, Zelenofske's lack of disinterestedness is no longer an issue and it is not necessary for Zelenofske to waive its prepetition claim. We note, however, that it is still not clear from the Supplemental Affidavit whether the Zelenofske Firm, while waiving fees as to Debtors, expects to be paid by Group or the Spencers, although nominally not its clients.

**8.** In his testimony, Mr. LaRosa stated that he would also be preparing financial schedules and reports and monthly operating statements as required by the Bankruptcy Rules. Our understanding is that those tasks will be performed inhouse and the Amended Application properly states the scope of the retention.

11 U.S.C. § 101(14). The disinterested requirement precludes the Rosen Firm, a creditor, from representing the Debtors generally or in the conduct of the bankruptcy case. *United States Trustee v. Price Waterhouse (In re Sharon Steel),* 19 F.3d 138, 141 (3rd Cir.1994). This disqualification serves the important policy of assuring that there be an impartial advisor between creditors. *In re NRG Resources, Inc.,* 64 B.R. 643, 647 (W.D.La.1986); *In re Interstate Distribution Center Associates (A), Ltd.,* 137 B.R. 826, 832 (Bankr.D.Col.1992).

Steinman argues that the contemplated role of the Rosen Firm, notwithstanding the averments of the Rosen Application, is so broad as to require the Court to apply the standards of § 327(a). He points to Rosen's testimony regarding his expected role as "second chair" in connection with the Motion to Appoint a Trustee.[9] In *Interstate Distribution,* the Court denied the debtor's application to employ previous counsel as "special counsel" where the nature of its contemplated services were of the type that are normally rendered by general bankruptcy counsel. In that case, counsel, due to its prepetition "familiarity with events and legal implications of matters impacting the bankruptcy proceeding" sought to continue providing services relating to ongoing business, real estate, environmental and partnership matters, to draft the disclosure statement and plan and to negotiate, along with debtor's general bankruptcy counsel, a settlement with a major secured creditor. *Id. See also In re Tidewater Memorial Hospital, Inc.,* 110 B.R. 221 (Bankr.E.D.Va.1989) (solicitation and negotiation of proposals for the sale or reorganization of the primary asset, including assisting the debtor with its plan of reorganization, is "tantamount to representing the debtor in the conduct of the case").

At first blush, it would appear that the contemplated role of the Rosen Firm does not fall within the proscriptions of the foregoing cases. The Rosen Firm is simply needed, according to the Debtors, to pursue the Steinman Litigation, and § 327(e) was expressly enacted to allow existing counsel to continue pending litigation post-bankruptcy notwithstanding its lack of disinterest. The problem with this analysis is that the Steinman Litigation is the bankruptcy case. There are no other creditor problems. Phoenix is current under its mortgage. With approximately $7000 of unsecured claims other than those of Rosen, Zelenofske and Group, which presumably Debtors can easily pay from rental income, there are no creditors around which to build a reorganization. While Debtors mentioned something about selling the real estate, they have not sought the appointment of a broker to list the property, indicating to the Court that it was their intention to sell the property after confirmation of their plan. More significantly, there is no reason that a sale could not be done outside bankruptcy. The bankruptcy, according to Debtors' counsel, was filed because of the mounting costs of the Steinman Litigation. Unlike, for example, debtors defending toxic tort cases that seek protection in bankruptcy to take advantage of the automatic stay to secure a breathing spell from litigation, Debtors do not intend to do so. Rather, the Debtors expect to continue the Steinman Litigation, albeit hopefully in this or another federal forum. All that seems to have occurred is that this two party dispute has been transferred from the State Court to Federal Court by cloaking the same claims and counterclaims in a new dress. A Motion for a Trustee brings to bear the issues raised in Count V of the Complaint requesting a receiver and the Debtors' objection to Steinman's proof of claim implicates the sanctions order of the State Court. The Debtors contemplate that the State Court Action will proceed as a "Related Proceeding" to this

---

9. Debtor has also filed an Objection to Steinman's proof of "claim" which seeks, *inter alia,* $744,250.00 as the value of his interest in the partnership or alternatively, "his capital contributions plus the proportional share of unauthorized 'fees' paid" to the Spencers. Exhibit S–9. Since the objection was filed, Steinman has filed an Amended Proof of Claim and a Proof of Interest. It would thus appear that many of the same issues will be raised by this contested matter and given Rosen's testimony, we would expect that he would be involved in the litigation. The other component of the claim is the attorneys fees, costs and sanctions awarded by the Superior Court on May 7, 1996. Again this is part of the State Court litigation and presumably Rosen, if retained by the Debtors, would handle this as well.

bankruptcy (which has only been filed because of the State Court Action) and the Federal Action (which likewise has only been filed as a result of the State Court Action). The Federal Action is to be continued and expanded. Counsel fees will be unabated. If there is any point to this bankruptcy proceeding, we fail to discern what it is. To the extent there is any bankruptcy purpose for this case, which we intend to question at the status hearing scheduled in our accompanying Order, it seems, by Debtors' counsel's own statement to revolve around the Steinman Litigation. Given that the role of litigation is preeminent in these cases, litigation counsel, not bankruptcy counsel, is the primary legal adviser. Indeed we see a very little role for bankruptcy counsel if the Rosen Firm is employed. Accordingly, we believe that the more rigorous standards of § 327(a) should be applied. Under § 327(a), the Rosen Firm, a creditor, is not disinterested and may not be employed.

■■■ Without relying on that conclusion, we observe that even under the less stringent requirements of § 327(e),[10] the Rosen Application must be denied because the Rosen Firm, in representing the Spencers and Group, represents a materially adverse interest to the interests of the Debtors in the Steinman Litigation. The determination of whether or not an adverse interest is held by an attorney is made on a case by case basis. The circumstances surrounding the Rosen Application have been set forth above. The Rosen Firm has represented and proposes to continue to represent the Debtors' principal, his solely owned management company and his father who serves as a financial consultant to the Debtors. Although all of the foregoing share the same goal as the Debtors

in repudiating the claims of Steinman, they do not share the same interests.[11] The most cursory analysis of the Complaint in the State Action makes this crystal clear. The thrust of the State Court Action is a charge of misconduct on the part of the Spencers in soliciting investment in Phoenix and the Spencers and Group in mismanaging Phoenix. Clearly the Debtors have no interest in defending the securities fraud allegation and have an adverse interest with respect to the mismanagement issue. For example, while Steinman seeks the appointment of a receiver, an action nominally against Phoenix, the objective is to oust Spencer and Group from control. We view that count also to be directed at the latter, and find what is in the best interests of Phoenix and its controlling parties, C. Spencer and Group, to be potentially materially adverse. The latter will resist a receiver at all costs since it means the loss of control and potentially cessation of management and leasing fees; the former, with the advice of independent counsel, might not. To the extent the Spencers and Group are charged with wrongfully appropriating partnership assets, there exists potential damage not only to Steinman and the other limited partners, but to the Debtors as well.[12] As was stated by the court in *In re Mican Homes, Inc.*, 179 B.R. 886, 888 (Bankr.E.D.Mich.1995):

> Under the Bankruptcy Code, the interests of the Debtor are intertwined with the interests of the estate which includes the interests of creditors. Simultaneous representation of a Chapter 11 Debtor and the Debtor's principals gives rise to at least a potential conflict of interest.

In defending the Spencers and Group against claims of wrongdoing which involve alleged

---

**10.** Not only is the disinterested requirement absent from § 327(e), but the section also "narrows the conflict of interest issue" to an evaluation of potential and actual conflicts "only as related to the particular matters for which representation is sought." *In re Statewide Pools, Inc.*, 79 B.R. 312, 314 (Bankr.S.D.Ohio 1987).

**11.** Notably, in *In re F & C International, Inc.*, 159 B.R. 220 (Bankr.S.D.Ohio 1993), the court aptly reasoned that even when unity of interest exists at the present, "[e]xperience has shown that in cases alleging fraud and mismanagement, the passage of time sometimes creates shifts in allegiances and difference in people's percep-

tions of fault, and thus, what is unity today, may be discord tomorrow." *Id.* at 222.

**12.** Rosen's reliance on the partnership agreement, Exhibit D–1, which allows the collective retention of one professional is irrelevant to the issue before this Court. Without reaching the issue of whether Rosen was required to secure consent from the limited partners to represent all the defendants pursuant to Rule 1.13 of the Pennsylvania Rules of Professional Conduct, we find that even had the firm done so, it would not have overcome the impermissible conflict that obtains.

diversions from Phoenix, the conflict is more than potential; it is actual and it is fatal to this Application. *See also Colorado National Bank of Denver v. Ginco, Incorporated (In re Ginco, Incorporated)*, 105 B.R. 620, 621 (D.Col.1988) (dual representation of principal shareholder, officer and guarantor and debtor is sufficient conflict to be adverse interest under § 327(a) and (e) where individual is potential target for claims of mismanagement); *In re F & C International, Inc.*, 159 B.R. 220 (Bankr.S.D.Ohio 1993) (counsel, which sought approval under § 327(e) to represent debtor in litigation involving fraud claims against its outside accounting professionals, had interest adverse to the estate since it also represented debtor's outside directors in matters arising from such fraud).

The conclusion we reach is more than hypothetical. We find evidence of Rosen's inability to serve both masters (*i.e.*, debtors and related parties) in this very Application. By securing the retention of the Rosen Firm, the Debtors would bear the economic burden of the Steinman Litigation; the Rosen fees would be payable by the Debtors as an administrative claim in this consolidated case.[13] The services sought to be rendered include, most prominently, pursuit of the Federal Action. The Federal Action emanates from the events surrounding the issuance by the State Court of the sanctions order, Exhibit D–4, which imposes penalties on *Spencers and Group* for failure to produce documents and orders all defendants to show· cause for "willful multiple obstructions of discovery" and violations of prior orders. In the Federal Action Complaint, Phoenix, the sole plaintiff,[14] complains of Steinman's conduct in issuing subpoenas to third parties in connection with projects totally unrelated to Phoenix, but presumably related to the

Spencers. Complaint ¶ 25. Opposition to those subpoenas had been the subject of legal activity on behalf of all defendants even though the Spencers' interests in having the discovery blocked is far different than the Debtors' interest which at best is non-existent and at worst is adverse. Yet it is in Phoenix's name that the Federal Action is pursued, and it is Phoenix which is being asked to retain and pay for counsel to prosecute these charges which have been framed as solely violations of its constitutional rights. Given further that the principal charges in· the State Court Action are lodged against the Spencers and Group, the Debtors' willingness, indeed eagerness, to retain the Rosen·Firm brings into question not only the independence of proposed special counsel but that of general counsel who presumably has reviewed the circumstances before filing the Rosen Application. In summary, we find that the retention contemplated by the Rosen Application is impermissible because of the conflicts we have identified as well as because it exceeds the benefit that could be conferred on these estates. *See In re French*, 139 B.R. 485, 490 (Bankr.D.S.D.1992).

### B. *The Zelenofske Application*

We recognize that the Zelenofske Application was filed on May 17, 1996 at which time the Report was not fully completed. It was so at the time of the hearing on July 2, 1996. If we had been asked to approve Zelenofske prospectively to conduct the investigation and issue a Report on behalf of the Debtors, we would have concluded that the benefit to the *Debtors* from this engagement was not established based on the record made on the Applications. In this respect, we agree with the U.S. Trustee.

The Debtors have not attempted to justify the need for the Report as a defense tool in

---

13. The Partnership Agreement provides that Phoenix will indemnify the General Partner (*i.e.* Argus) and any of its Affiliates for loss or damages unless they are guilty of gross negligence or willful misconduct. Exhibit D–1 ¶ 8D. Notably this contingent obligation of the Debtor Phoenix is a prepetition claim. *See In re Philadelphia Mortgage Trust*, 117 B.R. 820, 830–831 (Bankr. E.D.Pa.1990). The result of employing Rosen to represent the Debtors is to elevate the claim against the Debtor from a contingent unsecured claim to an administrative claim. The Rosen Application does not recognize this harm to the

Debtor Phoenix and assumes that because of the indemnification provision Phoenix should bear the entire cost of the litigation.

14. The Federal Action Complaint is curiously silent as to the existence of the other related parties in this drama. While the State Court Orders impose different sanctions on the various defendants, the Complaint narrates as though the sole actors in the scenes were Phoenix and Steinman.

connection with the separate claims against the Debtors in the State Court Action for which the Report was prepared.[15] Indeed the Debtors have never contended that the Zelenofske investigation would have been initiated if Steinman's claims were only directed at Debtors. Rather Debtors have engaged in the following flawed logic: (1) The Report is needed to defend the Steinman Litigation; (2) Debtors are defendants in the Steinman Litigation; and (3) Debtors should retain Zelenofske to investigate the charges and prepare the Report. This syllogism fails to account for the differing nature of Steinman's claims against the Debtors, the Spencers and Group. While Debtors have not focused on the necessity of the investigation vis-a-vis the claims against Debtors, we will do so.

Argus is named in Counts II, III, IV, VII and VIII.[16] The only counts that involve Phoenix are Counts V, VII and VIII. A perusal of Counts II, III and IV reveals no averments relating to the conduct of Argus and focuses on Argus' awareness of and benefit from the alleged fraudulent and negligent misrepresentations and material omissions of C. Spencer and Group. The thrust of the investigation was to determine the propriety of payments to the Spencers and Group. Zelenofske's conclusions do not appear directed to the defense of Argus in Counts II, III and IV.

Count VII seeks an accounting, and Count VIII claims breach of the partnership agreement by reason of the encumbrance of partnership property without partner consent. Count V seeks a receivership for the partnership based on the alleged fraudulent conduct of C. Spencer. The Zelenofske investigation was directed at these charges and the requests for legal and equitable relief against Phoenix and Argus. Yet we do not believe that Zelenofske, being directed by C. Spenc-er, is sufficiently independent to respond to those claims on behalf of the Debtors. For example, in examining the propriety of a loan which required partner consent, it relied solely on the advice of C. Spencer that such consent had been received and secured no independent verification from the partners. Also it seems counterintuitive to defend a demand by a partner for an independent accounting by authorizing the Debtors to have one performed under the control of the alleged wrongdoer. Finally, to the extent Zelenofske's work is utilized to support C. Spencer's efforts to remain in control of Phoenix and avoid a receivership, we believe it is C. Spencer and not Phoenix that should retain Zelenofske, and Phoenix should have the benefit of an independent analysis of the need for a receiver. Should C. Spencer be vindicated in the lawsuit, he will have his rights of indemnification for his costs. Therefore, as to Zelenofske's retention for purposes of the investigation and preparation of the Report, its retention is denied.

■ The sole remaining task for which Zelenofske's retention is sought, and the only task which remains uncompleted at this time, is Debtors' use of Mr. LaRosa's testimony in connection with their defense of the Steinman litigation. We find it unnecessary for Debtors to retain Zelenofske as a professional, which would have the undesired effect of visiting all of the firm's post-petition costs on the Debtors, to effectuate this task. Presumably Mr. LaRosa can be called by Debtors' counsel as an expert witness if, in the exercise of its *independent* judgment, the Report is needed to defend *Debtors*.[17] We do not believe Debtors' counsel has engaged in that analysis at this point in time since its justification for the Zelenofske Report does not recognize the differing interests of the parties. If counsel, after exercising its judgment, decides to utilize Mr. LaRosa or anoth-

---

**15.** Since the Trustee Application and Objection to Steinman's Claim were not filed until the Report was completed, it is clear that the investigation and resultant Report were intended for the purpose of defense of the State Court Action. Having so found, it is not inconsistent to expect that the Report's conclusions would be sought to be utilized in this Court which is the present situs of the same claims and defenses.

**16.** See footnote 3 *infra*.

**17.** This Court should not and will not impose its judgment on the strategy and tactics to be employed to defend the Debtors in the State Court Action and prosecute the Federal Action. They are to be determined by counsel who has been approved by the Court as disinterested and free of conflict and whose compensation and cost reimbursements are tied to its proper exercise of discretion and responsibility in managing that litigation. If the Debtors should call Mr. LaRosa as an expert witness, Steinman's counsel would

er individual from the Zelenofske firm as an expert witness for the Debtors, the firm's retention under § 327 is not required since the Report does not affect the administration of the estate.[18] Counsel can seek to be reimbursed the costs of its experts on application to the court pursuant to § 330(a)(1)(B). Whether its application will be granted will depend on whether it has exercised its discretion in the best interest of the estate.

An Order consistent with this Opinion shall be entered.

### ORDER

**AND NOW,** this 6th day of August, 1996, upon consideration of the (1) Application to Employ Spector, Gadon & Rosen, P.C. and (2) Application to Employ Zelenkofske Axelrod & Co., Ltd. filed by the Debtor in the above Chapter 11 cases, and after notice and hearing, and for the reasons set forth in the accompanying Opinion,

It is hereby **ORDERED** and **DECREED** that:

1. The Rosen Application is **DENIED.**

2. The Zelenofske Application is **DENIED.**

3. Pursuant to 11 U.S.C. § 105(b), a hearing will be held on August 19, 1996 at 9:30 a.m. in Courtroom # 2 (Room 3718), United States Courthouse, 601 Market Street, Philadelphia, PA to discuss the status of these bankruptcy cases (and in particular the issue raised by the Court in the accompanying Opinion at page 12) and the contested matters and adversary proceedings filed within. Debtors will provide notice of this hearing to all interested parties.

---

have the opportunity in cross examination to challenge his conclusions as they relate to the Debtors.

**18.** Although the language of § 327 appears to suggest that accountants are professional persons as to whom court approval must be sought, the better view is that it is the person's duties, not his status, that is determinative. *Elstead v. Nolden (In re That's Entertainment Marketing Group, Inc.),* 168 B.R. 226, 230 & n. 3 (N.D.Cal.1994). In *Elstead,* the central issue to be resolved was whether an accounting firm hired by special counsel to the trustee to serve as an expert witness in litigation of an intellectual property action needed to be approved by the court to be awarded compensation by the trustee. In answering that question in the negative, the court quoted the bankruptcy court in *In re Johns–Manville Corp.,* 60 B.R. 612, 619 (Bankr.S.D.N.Y. 1986), that the term "professional person" is a "term of art reserved for those persons who play an intimate role in the reorganization of a debtor's estate." *See also In re Sieling Associates Ltd. Partnership,* 128 B.R. 721, 723 (Bankr.E.D.Va. 1991) ("[I]f the duties involved are central to the administration of the estate, such duties are professional in nature."); *Matter of D'Lites of America, Inc.,* 108 B.R. 352, 355 (Bankr.N.D.Ga.1989) ("a professional person is one who takes a central role in the administration of the bankruptcy estate and in the bankruptcy proceedings"); *In the Matter of Seatrain Lines, Inc.,* 13 B.R. 980, 981 (Bankr.S.D.N.Y.1981) (same). It then found that an accountant that is "retained solely to testify as an expert witness in collateral litigation does not assume a central role in the administration of the bankruptcy" because "an expert witness is not in a position to formulate strategy or to manage the estate and the liabilities of the estate." 168 B.R. at 230. The court in *In re Babcock Dairy Company of Ohio, Inc.,* 70 B.R. 691, 692 (Bankr.N.D.Ohio 1987), likewise found that the expert witness' relationship to the administration of the debtor's estate is too tangential for the expert to be considered a § 327 professional. *See also Johns–Manville,* 60 B.R. at 619–621 (lobbyists who were retained by debtor to perform same lobbying activities that had been performed in ordinary course of debtor's business were not "professional persons" under § 327(a) as they did not perform services peculiar to administration of bankruptcy estate).